# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

## WESTERN DIVISION

| | |
|---|---|
| BRIAN WINTERS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>3M Company,<br><br>　　　　Defendant. | Case No.:4:19-cv-120<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff brings the action, and alleged the following on based on information and belief, the investigation of counsel, and personal knowledge:

## NATURE OF THE ACTION

1. This case arises from a defective earplug manufactured by Defendant and sold to the United States Army for use by American soldiers. Plaintiff was issued a set of Defendant's dual-ended Combat Arms Earplugs-Version 2 ("Combat Arms Earplugs"). Plaintiff used the earplugs and, as a result of its defective condition and Defendant's misrepresentations, now suffers from permanent hearing loss.

## PARTIES

2. Brian Winters ("Plaintiff") served in the U.S. military from 1996 through 2015. During this time, Plaintiff was deployed all over the world. Plaintiff is a resident of Kansas City, Missouri.

3. Defendant 3M is a Delaware corporation with its principal place of business in Saint Paul, Minnesota. At all times relevant herein, Defendants were engaged in the business of placing Combat Arms Earplugs into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling Combat Arms Earplugs. Defendants manufacture, market, advertise, promote and sell Combat Arms Earplugs nationwide.

## JURISDICTION

4. This Court has subject matter jurisdiction because there is complete diversity between Plaintiff and Defendant. 28 U.S.C. § 1332(a)(1) and the amount in controversy exceeds $75,000 exclusive of costs and interest.

5. This Court has personal jurisdiction over Defendant because it regularly conducts business in Missouri, and has sufficient minimum contacts with Missouri. Defendant intentionally availed itself of this jurisdiction by marketing and selling products, including Combat Earplugs. Defendant has a registered agent for service of process in Minnesota. A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the federal judicial district identified in this Complaint. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

## VENUE

6. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and Defendant has caused harm in this District.

# FACTUAL ALLEGATIONS

**Plaintiff's Military Service**

7. Plaintiff joined the Navy as a missile technician in 1995 at the age of 20. Before joining the Navy, Plaintiff had no signs or symptoms of hearing loss.

8. During his enlistment, Plaintiff was onboard two submarines that traveled all over the world. He served on the USS Kentucky for 5 years from 1996 to 2001, which is a ballistic missile submarine, followed by a weapons facility in Missouri from 2001 to 2004. He served on the USS Louisiana for 3 years from 2004 to 2007, a nuclear-powered fleet ballistic missile submarine, followed by a weapons facility in Washington from 2007 to 2012.

9. Plaintiff was provided 3M's Dual-Ended Combat Arms™ Earplugs while in the service of the United States Army. As a result of using 3M's Dual-Ended Combat Arms™ Earplugs, Plaintiff suffered severe and permanent injuries, including hearing damage.

10. As of 2004, all soldiers deployed to Iraq and Afghanistan were issued Dual-Ended Combat Arms™ Earplugs. These earplugs were originally created by a company called Aearo Technologies ("Aearo"). 3M acquired Aearo in 2008 for $1.2 billion dollars and hired the Aearo employees that developed and tested the defective earplugs. These 3M employees were aware of the defects as early as 2000, several years before 3M/Aearo became the exclusive provider of the earplugs to the military.

11. Post-acquisition, the Combat Arms earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and referred to herein as "Defendants."

12. The 3M Combat Arms earplugs have dangerous defects that can cause them to loosen in the wearer's ear, unknown to the wearer and even trained audiologists visually observing a wearer, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug while the user and/or audiologist incorrectly believes that the earplug is working as intended. Because the stem of the dual-ended earplug is too short, it is difficult to insert the plug deeply into some wearer's ear canals and obtain a proper fit. The defect has the same effect when either end is inserted because the earplugs are symmetrical. In either scenario, the effect is that the earplug may not maintain a tight seal in some wearers' ear canals such that dangerous sounds can bypass the plug altogether thereby posing serious risk to the wearer's hearing unbeknownst to him or her.

13. The 3M Combat Arms earplugs were designed for the specific purpose of providing servicemen and women a single set of earplugs that provide two options for hearing attenuation depending on how they are worn.

14. These dangerous design defects were known to Aearo in 2000 (and later 3M) when it completed testing of the dual-ended Combat Arms™ earplugs. Notwithstanding, Aearo submitted a bid in response to the military's Request for Proposal to supply large quantities of these defective earplugs and entered into a contract pursuant to which it became the exclusive supplier of earplugs to the military in approximately 2003.

15. Prior and subsequent to entering into this contract, Defendant also failed to inform anyone that it had previously instructed its test subjects to manipulate the earplugs in order to achieve efficacy based on the short stem. As such, Plaintiff used the earplugs according to the instructions provided, which were inadequate, and suffered significant hearing loss and damages as alleged herein.

**Combat Arms Earplugs Are Defective and Deviated from Specifications**

16. Defendant represented that the Combat Arms earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs.

17. However, at all times, Defendant's performance representations were false; and Defendant knew them to be false. In fact, Defendant knew these earplugs were defective and misrepresented information pertinent to the safety and efficacy of the earplugs well before Defendant became the exclusive supplier of earplugs to the U.S. military.

18. The Combat Arms earplugs had a dangerous design defect that caused them to loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals.

19. The symmetrical design of the earplug meant that this design defect would occur whether a user inserted the earplugs in the blocked or unblocked potion. This defect was known to Defendant as early as 2000.

20. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms earplug inserted.

21. Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms earplug inserted after only 8 of the 10 subjects had been tested and manipulated the NPR and rating on its labels.

22. During this process, Defendant learned that the stem of the earplug was too short, and, as a result, it was difficult to insert the earplug deeply enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. *See* Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975). Therefore, Aearo manipulated the test protocol by instructing the test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear. This information was not disclosed to end users or to Plaintiff.

23. Using the manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms earplugs starting in February 2000. During this re-test of the green end,

test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short defective stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms earplug.

24. Due to the symmetrical nature of the Combat Arms earplugs, the design defect that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

25. Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end because it knew that it would not be able to reach a satisfactory NPR, which was a key selling point in its marketing pitch to the U.S. military.

**Defendant's False Certifications to the U.S. Military**

26. In 2003, Aearo submitted a bid in response to the U.S. military's Request for Proposal ("RFP") to supply large quantities of Combat Arms earplugs. The RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202. In its bid,

7
Case 4:19-cv-00120-RK   Document 1   Filed 02/19/19   Page 7 of 18

Aearo certified the Combat Arms earplugs complied with the MPID, even though Aearo knew that certification to be false.

27. The pertinent Salient Characteristics of MPID in each RFP, in relevant part, were:

> 2.1.1. Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.
> 2.2.2 The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19….
> 2.4. <u>Workmanship</u>. The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.
> 2.5. <u>Instructions</u>. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit….

Solicitation No. SP0200-06-R-4202, at 41-42.

28. Aearo knew that its test protocol did not comply with ANSI S3.19 but nevertheless certified that its testing was fully compliant with the U.S. military's specifications.

29. Aearo also falsely certified that it provided accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew when it did so that its own testing had revealed a design defect that needed modified fitting instructions to ensure a proper fit that would deliver the promised NRR. At no time did Defendant disclose the modified fitting instructions to the U.S. military—even after winning the bid.

30. Pursuant to Section 2.4 of the MPID, Aearo was required to certify that the "ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." Despite Aearo knowing since 2000 that its Combat Arms earplugs suffered from a design defect, Aearo certified to the U.S. military that its earplugs had no defects.

31. Based on its facially invalid test results, Aearo falsely reported to the U.S. military that the yellow end of its Combat Arms earplugs had a 0 NRR, which would allow servicemen to freely communicate with their fellow servicemen and avoid any impairment to hear enemy combatants.

32. Aearo also certified that the green end of its Combat Arms earplugs had a 22 NRR, even though Aearo did not disclose the modified fitting instructions necessary to achieve the hearing protection afforded by a 22 NRR. Nothing in these fitting instructions disclosed that it was necessary to fold back the flanges of the opposite end to ensure a proper fit and achieve the promised NRR. By failing to provide this disclosure, Aearo falsely overstated the amount of hearing protection afforded by the green end of the earplug and overstated the benefits of the yellow end of the earplug.

33. Based on Aearo's false representations, its bid was the prevailing bid and Aearo entered into the first of a series of IQCs later that year making it the exclusive provider of selective attenuation earplugs to the U.S. military.

34. Importantly, and in response to future RFP's, Defendant re-certified that the Combat Arms earplugs met the MPID criteria, even though Defendant knew that to be false.

35. Indeed, Defendant continued to sell the Combat Arms earplugs to the U.S. military until late 2015, at which time Defendant discontinued the earplug. However, Defendant did not recall the earplugs despite discontinuing them due to the design defect.

36. Defendant's misrepresentations about the benefits and protections provided by the Combat Arms earplugs caused Plaintiff to suffer hearing loss.

## TOLLING OF STATUTES OF LIMITATIONS

37. Under the Servicemembers Civil Relief Act, the period of Plaintiff's military service may not be included in computing any statute of limitations applicable herein. *See* 50 U.S.C. § 3936.

38. Plaintiff could not, by the exercise of reasonable diligence, have discovered Defendant's wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

39. Further, the running of the statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff the risks associated with the defects in the Combat Arms earplugs.

40. As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that he had been exposed to the defects and risks alleged herein, and that those defects and risks were the direct and proximate result of Defendant's acts and omissions.

41. Through Defendant's affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms earplugs, Plaintiff was prevented from discovering this information sooner because Defendant misrepresented and continued to misrepresent the defective nature of the Combat Arms earplugs.

## COUNT I:

### NEGLIGENCE

42. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

43. Defendant each had a duty to use their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar business by a person or entity in Defendant's business of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

44. Defendant further had a duty to comply with the certifications made to the U.S. government about the qualities and performance characteristics of the Combat Arms earplugs. Plaintiff is among the class of persons designed to be protected by these regulations and certification standards. He was a foreseeable plaintiff to Defendant.

45. Defendant breached these duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices in a manner to provide the specified level of hearing protection.

46. The damages suffered by Plaintiff was or should have been reasonably foreseeable to Defendant.

47. Plaintiff was damaged by Defendant's conduct, including but not limited to damage to his hearing.

48. Defendant's breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiff in an amount not yet fully determined, but in excess of $75,000.00, exclusive of costs and interest. Plaintiff is entitled to recover damages and

other relief as available, at law or equity, as a direct and proximate result of Defendant's conduct.

## COUNT II:

## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

49. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

50. Defendant is the manufacturers and sellers of the defective Combat Arms earplugs.

51. The defective Combat Arms earplugs that Defendant manufactured, distributed, and sold were, at the time they left Defendant's control, defectively designed in that the design of the earplug caused it to loosen in the wearer's ear, which allowed damaging sounds to enter the ear canal.

52. The defective Combat Arms earplugs that Defendant manufactured, distributed, and sold were, at the time they left Defendant's control, defective and unreasonably dangerous for their ordinary and expected use because they did not stop the damaging loud noises of military use that can cause hearing loss.

53. The defective Combat Arms earplugs that Defendant manufactured, distributed, and sold were, at the time they left Defendant's control, defective and not reasonably safe for its intended use.

54. Defendant knew of the defect in the Combat Arms earplugs.

55. No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge that Defendant had, namely that the stem of the earplug was

too short to fit correctly in many people's ears and that if not fitted correctly the earplugs would not guard against loud impulse noises and could cause hearing loss.

56. The defective Combat Arms earplugs that the Defendant manufactured, distributed, and sold were delivered to Plaintiff without any change in their defective condition and were used by Plaintiff in the manner expected and intended.

57. Defendant owed a duty of care to Plaintiff to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by servicemen to protect them from damaging noises typically incurred in military service. Defendant breached this duty.

58. Defendant owed a duty of care to Plaintiff to design and sell earplugs that were fit for use in military service and that performed according to the specifications that Defendant certified the Combat Arms earplugs would meet. Defendant breached this duty.

59. Defendant owed a duty of care to Plaintiff to design and sell earplugs that were safe when used for their intended purpose; i.e., when in the presence of loud impulse sounds.

60. Defendant breached this duty

61. Plaintiff suffered injury and damage as a direct and proximate result of the defective and unreasonably, unsafe, dangerous condition of the Combat Arms earplugs that the Defendant manufactured, distributed, and sold.

13
Case 4:19-cv-00120-RK   Document 1   Filed 02/19/19   Page 13 of 18

## COUNT III:

## STRICT PRODUCT LIABILITY – FAILURE TO WARN

62. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

63. Defendant is the manufacturers and sellers of the defective Combat Arms earplugs.

64. The defective Combat Arms earplugs that Defendant manufactured, distributed, and sold were, at the time they left Defendant's control, defective because the earplugs did not come with adequate warnings, instructions, or labels.

65. The defective Combat Arms earplugs that Defendant manufactured, distributed, and sold were, at the time they left Defendant's control, defective because Defendant failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the earplug to fit correctly in the wearer's ear and create the seal necessary to block out the damaging sounds.

66. Defendant had a duty to manufacture, design, and sell the Combat Arms earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff. Defendant breached that duty.

67. Defendant had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms earplugs when worn in the ordinary course. Defendant breached that duty.

68. It was foreseeable to Defendant that the Combat Arms earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

69. Not only was it foreseeable, it was foreseen by Defendant. During testing, Defendant discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

70. Defendant also discovered that when the green end of the Combat Arms earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms earplug was symmetrical, this same problem occurred when the earplug was reversed.

71. Defendant had a post-sale duty to warn of the above alleged product-related defects and risks because Defendant knew or reasonably should have known that the Combat Arms earplug posed a substantial risk of harm to servicemen, including Plaintiff; the servicemen who used the Combat Arms earplug can reasonably be assumed to be unaware of the risk of harm caused by the above-alleged defects because said defects were imperceptible; a warning or instruction showing how to correctly and safely use the Combat Arms earplug could have been effectively communicated to and acted upon by the servicemen to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in servicemen, is sufficiently great to justify the

slight burden of providing a warning or instruction. Defendant breached this duty by failing to provide a post-sale warning or instruction.

72. The Combat Arms earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing unbeknownst to Plaintiff.

73. The warnings and instructions that accompanied the Combat Arms earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms earplugs in a manner reasonably foreseeable to Defendant.

74. Had Plaintiff received a proper or adequate warning as to the risks associated with the use of the Combat Arms earplugs in the manner contemplated by Defendant, he would not have used them.

75. Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by Defendant during the testing, which were not disclosed to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

76. Plaintiff suffered injury and damage as a direct and proximate result of the use-defectiveness and Defendant's failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms earplugs that the Defendant manufactured, distributed, and sold.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests from Defendant compensatory damages, together with appropriate equitable relief, costs and attorneys' fees as follows:

A. Award of monetary damages, including compensatory relief, to which Plaintiff is entitled at the time of trial in an amount exceeding $75,000, exclusive of costs and interest.

B. Award of pre- and post-judgment interest.

C. Award of costs.

D. Award of all such other and further relief as may be available at law or equity and may be proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 19, 2019

WAGSTAFF & CARTMELL, LLP

/s/ Jeffrey M. Kuntz
Thomas P. Cartmell   MO#45366
John O'Connor   MO#32352
Jeffrey M. Kuntz   MO#52371
Tom Rottinghaus   MO#50106
Diane K. Watkins   MO#57238
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1100
tcartmell@wcllp.com
joconnor@wcllp.com
jkuntz@wcllp.com
trottinghaus@wcllp.com
dwatkins@wcllp.com


CLARK, LOVE & HUTSON, G.P.
Clayton A. Clark
Texas State Bar No. 04275750
Scott A. Love
Texas State Bar No. 24002495
W. Michael Moreland
Texas State Bar No. 24051080
440 Louisiana St., Ste. 1600
Houston, TX 77002
Phone: (713) 757-1400
cclark@triallawfirm.com
slove@triallawfirm.com
mmoreland@triallawfirm.com

**Attorneys for Plaintiff**